IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

CARLOS CUESTA-RODRIGUEZ,     )
                                     )
        Petitioner,            )
                                     )
vs.                           )     Case No.  CIV-11-1142-M
                                     )
TERRY ROYAL, Warden,         )
        Oklahoma State Penitentiary,   )
                                     )
        Respondent.[1]       )

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254.  Doc. 17.  Petitioner challenges the conviction entered against him in Oklahoma County District Court Case No. CF-03-3216.  Tried by a jury in 2007, Petitioner was found guilty of first degree murder and sentenced to death.  In support of his death sentence, the jury found two aggravating circumstances:  (1) the murder was especially heinous, atrocious, or cruel, and (2) the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society.  Criminal Appeal Original Record (hereinafter "O.R.") VII, at 1226, 1231-32.

Petitioner has presented ten grounds for relief.  Respondent has responded to the petition and Petitioner has replied.  Docs. 17, 33, and 38.  In addition to his petition,

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Terry Royal, who currently serves as interim warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in this case.

Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 19 and 27. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. *Cuesta-Rodriguez v. Oklahoma*, 241 P.3d 214, 247 (Okla. Crim. App. 2010). Petitioner sought review of the OCCA's decision by the United States Supreme Court, which denied his writ of certiorari on January 18, 2011. *Cuesta-Rodriguez v. Oklahoma*, 132 S. Ct. 259 (2011). Petitioner also filed two post-conviction applications, which the OCCA denied in unpublished opinions. *Cuesta-Rodriguez v. Oklahoma*, No. PCD-2012-994 (Okla. Crim. App. Feb. 8, 2013); *Cuesta-Rodriguez v. Oklahoma*, No. PCD-2007-1191 (Okla. Crim. App. Jan. 31, 2011).

## II. Facts.

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by Petitioner, the Court finds that Petitioner has not done so, and that in any event, the OCCA's statement

of the facts is an accurate recitation of the presented evidence. Thus, as determined by the

OCCA, the facts are as follows:

Olimpia Fisher, the victim in this case, and her adult daughter Katya Chacon lived with [Petitioner] in a home that Fisher and [Petitioner] had purchased together. In the year after the couple purchased the home, their relationship had become strained over Fisher's long working hours as a moving company packer and [Petitioner's] fears that she was cheating on him. [Petitioner] would question Fisher and Chacon whenever they left the home about where they were going and what they would be doing. Eventually, the relationship deteriorated to the point that [Petitioner] wanted Fisher to move out and Fisher wanted [Petitioner] to move out.

On May 20, 2003, Fisher went to the Santa Fe Station of the Oklahoma City Police Department to make a complaint of domestic abuse. Officer Jeffrey Hauck observed bruising on her right upper arm and stomach. When Fisher found out that Officer Hauck was going to take photographs of the bruising and that [Petitioner] would be arrested, she ran out of the station.

On Friday May 31, 2003, [Petitioner] tried calling Fisher on her cell phone. She answered and told him she was at work. [Petitioner] had gone by her place of work, however, and knew she was not there. Believing she was cheating on him, he went home, drank some tequila, and went to bed.

Katya Chacon came home to a dark house at approximately 10:00 p.m. She saw an empty bottle of tequila and a note next to it. The note, written on the back of an envelope, said "F—— you bitches and puntas, goodbye" []. She thought she was alone in the house, but when she heard [Petitioner] cough in the other room, she tried to telephone her mother. Unable to contact Fisher by telephone, Katya left the house and joined her as she was getting off work. They ate a late meal at a McDonald's restaurant, and went home. They initially planned to pack and leave, but decided to remain in the house overnight. Katya slept in her own bedroom and Fisher slept in a third bedroom.

Around 4:30 a.m., Katya woke up and heard Fisher and [Petitioner] arguing. Katya went into the bedroom where the two were fighting and persuaded Fisher to come to Katya's bedroom in the hope that [Petitioner] would leave them alone. [Petitioner] followed the women into Katya's bedroom while continuing to argue loudly with Fisher. Fisher picked up a

telephone, but [Petitioner] snatched it out of her hand and threw it away. At the same time, he pulled out a double-barreled .45 caliber pistol loaded with two .410 shotgun shells and blasted Fisher in the right eye.[FN1] With her mother shot, Katya retrieved a baseball bat from under the bed and tried to hit [Petitioner] in the hand. [Petitioner] grabbed the bat as Katya swung it and threw it to the floor.[FN2] Katya ran from the house and was able to call 911 from a neighbor's residence. According to [Petitioner's] statement to police, Fisher was still alive and conscious after he shot her so he took her to his bedroom where, despite having an eye blown out, Fisher continued to fight and struggle.

> FN1. Katya Chacon testified that the gunshot hit the right side of Fisher's face.

> FN2. [Petitioner] told police that Katya beat him with a baseball bat before he shot Fisher. [Petitioner] also told police that the gun went off as Fisher attempted to wrestle it from him. [Petitioner] said the shot hit near her eyes, but thought it might have hit near her left eye.

The first police officers arrived on the scene at approximately 4:41 a.m., within two minutes of being dispatched by 911. While one officer took information from Katya near the neighbor's house from where she had called 911, other officers approaching [Petitioner's] and Fisher's house could hear Fisher screaming and banging on a bedroom window as if she was trying to escape. The windows and doors to the house were covered with burglar bars that not only prevented her escape, but also prevented entry by police. The officers' first attempt at entry by kicking in the front door failed. While attempting to get through the front door, officers heard a gunshot and Fisher's screams stopped.

Certain that Fisher was no longer alive, and certain that [Petitioner] was armed, police summoned their tactical team. In the meantime, a police hostage negotiator attempted to make telephone contact with [Petitioner] and used a loudspeaker in an attempt to convince him to come out. Eventually, the tactical team forced their way through the front door burglar bars with some difficulty using a specialized hydraulic tool called a jam-ram. [Petitioner] was arrested and taken to the police station. He gave statements to detectives that day and the next day. In both interviews he admitted shooting Fisher, although he claimed the first shot was accidental. Photographs of Fisher's face taken at the

scene, and introduced as trial exhibits, showed severe injuries centered on her eyes.[FN3]

> FN3.  In addition to being the situs of Fisher's injuries, Fisher's eyes came up in another context. According to the testimony of Fisher's former boyfriend, when Fisher terminated their relationship in favor of [Petitioner], Fisher said that she had "put her eyes on somebody else" []. The ex-boyfriend stated he was familiar with Fisher's use of this unusual phrase because she previously told him that if she put her eyes on somebody else, that meant she was "interested in him" [].

*Cuesta-Rodriguez*, 241 P.3d at 222-23.

## III.  Standard of Review.

### A.    Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**B.  Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

**C.  Merits.**

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs his ability to obtain relief. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision. "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Relief is warranted only "*where there is no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Id*. (emphasis added). The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

### IV. Analysis.

#### A. Ground One: Confrontation Clause Violation.

Petitioner challenges the OCCA's ruling on his Confrontation Clause claim regarding the testimony of Dr. Jeffrey Gofton. Petition at 6. Dr. Gofton served as the Chief Medical

Examiner at the time of Petitioner's trial and testified to Olimpia Fisher's cause and manner of death. *Id*. Dr. Gofton testified, but Dr. Jordan, the retired former Chief Medical Examiner, actually performed Fisher's autopsy. *Id*. The trial court admitted three diagrams that Dr. Jordan created. *Id*. Dr. Gofton also recited several of Dr. Jordan's findings during his testimony. *Id*. at 7.

On direct appeal, the OCCA found that the admission of the autopsy diagrams and Dr. Gofton's recitation of Dr. Jordan's findings violated the Confrontation Clause. *Cuesta-Rodriguez*, 241 P.3d at 229. But the OCCA held that Dr. Gofton's opinions that were *based* on Dr. Jordan's findings did not violate the Confrontation Clause. *Id*. at 229-30. Still, the OCCA analyzed whether admitting Dr. Gofton's *entire* testimony constituted harmless error, and found that that even without the testimony, the jury still heard sufficient evidence to find Petitioner guilty and sentence him to death. *Id*. at 230-31.

### 1.    *Clearly Established Law.*

The Confrontation Clause prohibits the admission of testimonial evidence unless the declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In *Melendez-Diaz v. Massachusetts*, the Supreme Court determined that crime lab analysis certificates were "testimonial" statements under *Crawford*, because the certificates were "quite plainly affidavits." 557 U.S. 305, 308-10 (2009). The Court went on to explain that since the

certificates were created for use at trial, they did not qualify as "business records." *Id*. at 321-22. *Melendez-Diaz* established that documents akin to those certificates were testimonial under *Crawford* and subject to the Confrontation Clause.

*Melendez-Diaz* did not resolve whether such testimonial reports were admissible if introduced through a testifying scientist when that scientist did not sign the certification or perform or observe the test or tests within the certification. *Bullcoming v. New Mexico* resolved that question two years later. 131 S. Ct. 2705, 2710 (2011). *Melendez-Diaz* also did not determine whether the Confrontation Clause applies to out-of-court statements related by the expert merely to explain the basis for the expert's opinion, an issue the Supreme Court took up in *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012). Most relevant to this claim, *Melendez-Diaz* does not prevent experts from offering their opinions, even when the experts based those opinions on testimonial statements of non-testifying witnesses. *See United States v. Pablo*, 625 F.3d 1285, 1292 (10th Cir. 2010) *vacated*, 133 S. Ct. 56 (2012) (vacated for consideration under *Williams v. Illinois*).

The legal landscape after *Melendez-Diaz* only prevented experts from "parroting" another witness's testimonial, out-of-court statements. *Id*. Experts could still convey independent judgment that "only incidentally discloses testimonial hearsay to assist the jury." *Id*. Doubtless *Bullcoming* and *Williams* altered the landscape to some extent, but neither case existed when the OCCA ruled on Petitioner's claim, and therefore have no bearing on the reasonableness of the OCCA's decision. *See Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).

9

## 2.    *The OCCA's Application of Melendez-Diaz.*

The OCCA found that, in light of *Melendez-Diaz*, autopsy reports were testimonial under Oklahoma law, therefore Dr. Jordan's diagrams and Dr. Jordan's findings in the autopsy report should not have been disclosed to the jury unless Petitioner could cross-examine Dr. Jordan. *Cuesta-Rodriguez*, 241 P.3d at 228. In contrast, the OCCA found that "Dr. Gofton's opinions that the first gunshot to Fisher's face was not fatal, that she died by choking on blood caused by the second gunshot wound, and that Fisher did not die immediately, but may have lingered for up to eight minutes did not violate [Petitioner's] confrontation right." *Id*. at 230. Petitioner disagrees, claiming that Dr. Gofton's testimony was so intertwined with the autopsy report that his entire testimony violated the Confrontation Clause. Petition at 7.

Petitioner's position finds no support in the federal precedents that existed when the OCCA decided his case. The OCCA's conclusions were consistent with *Melendez-Diaz* regarding the diagrams and Dr. Gofton's parroting of Dr. Jordan's findings. And neither *Melendez-Diaz* nor any other existing federal law foreclosed Dr. Gofton's other testimony on Confrontation Clause grounds. Dr. Gofton's medical opinions sprang from his own independent judgment, although *based* in part on Dr. Jordan's findings. Petitioner even admits that Dr. Gofton contradicted Dr. Jordan's report and opined on issues that Dr. Jordan's report did not address. Reply at 6. That testimony belies Petitioner's argument that

Dr. Gofton simply parroted Dr. Jordan's findings. The OCCA's decision was not contrary to or an unreasonable application of existing federal law.

### 3. *Harmless Error.*

Confrontation Clause errors are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Federal habeas review must determine "whether, assuming that the damaging potential of cross-examination were fully realized, a reviewing court might nonetheless say that the error had substantial and injurious effect or influence in determining the jury's verdict." *Littlejohn v. Trammell*, 704 F.3d 817, 844-45 (10th Cir. 2013) (quoting *Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000)). Habeas courts conduct harmless error review *de novo*, and must consider factors such as the "importance of the witness' testimony to the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id*. (quoting *Van Ardsall*, 475 U.S. at 684).

Even though the OCCA only found error in part of Dr. Gofton's testimony, it conducted its harmless error analysis by considering the effect of Dr. Gofton's entire testimony. This Court does the same, and finds that the Confrontation Clause error in this

case did not have a substantial and injurious effect or influence in determining the jury's guilty verdict or death sentence.[1]

At the guilt stage, Dr. Gofton's cumulative testimony offered a scientific perspective on what other witnesses said: Fisher suffered a gunshot wound to the head, survived for a short time, and died after a second gunshot wound to the head. *Cuesta-Rodriguez*, 241 P.3d at 230. The prosecution's strong case did not hinge on Dr. Gofton's testimony. Other witnesses corroborated most of Dr. Gofton's testimony. While Petitioner argues that the testimony strengthened the persuasive value of the prosecution's case and distracted from other evidence, that possibility does not establish that Dr. Gofton's testimony had a substantial or injurious effect or influence on the jury's guilty verdict. In light of the *Van Arsdall* factors, the Confrontation Clause error was harmless as to the guilt stage.

The error was also harmless during the penalty stage. Numerous prosecution witnesses described the first shot, the elapsed time between shots, Ms. Fisher's conscious attempts to fight back and escape after the first shot, and the final shot. *Cuesta-Rodriguez*, 241 P.3d at 231. Dr. Gofton's testimony simply corroborated the other evidence. The prosecution called Dr. Gofton not because they could not make their case otherwise, but

---

[1] Respondent argues that the Confrontation Clause does not apply to capital sentencing proceedings. "[I]t is far from clear whether the Confrontation Clause even applies at capital sentencing proceedings." *Wilson v. Sirmons*, 536 F.3d 1064, 1111-12 (10th Cir. 2008) (internal quotation marks omitted). It is very likely the trial court did not commit any Confrontation Clause error as it related to the penalty stage. But this Court need not decide that issue definitely, because the evidence shows that the error was harmless in both stages of the trial.

because they opted to present more evidence, rather than less. Dr. Gofton's testimony was cumulative, corroborated, and not central to the prosecution's solid case at either the guilt or penalty stage. The Confrontation Clause errors did not have a substantial and injurious effect or influence on the jury's conclusions. Relief is denied as to Ground One.

## B.      Ground Two:  Limitations on Mitigating Evidence.

Petitioner argues that the trial court unconstitutionally limited mitigation testimony by Dr. Mark Hamm. Petition at 15. The defense retained Dr. Hamm as an expert on the Mariel Boatlift of 1980 and the experiences of the Cubans (like Petitioner) that came to American via the boatlift. *Id*. The prosecution moved to preclude Dr. Hamm's testimony. *Id*. Judge Elliott denied the motion, but limited Dr. Hamm's testimony to general matters related to his expertise; he could "not testify as to the specifics of [Petitioner's] case or testify as to hearsay statements made by [Petitioner's] mother or other relatives." *Cuesta-Rodriguez*, 241 P.3d at 239. At trial, Dr. Hamm testified about the conditions in Cuba when Petitioner lived there, the Mariel Boatlift, and conditions in the Atlanta penitentiary when Petitioner was in custody there. *Id*. at 240. The prosecution objected twice on relevance grounds, and Judge Black[2] sustained one of those objections. Petition at 16; Trial Tr. vol. VI, 1143-45. The prosecution also challenged the relevance of Dr. Hamm's testimony through cross-examination questions. Trial Tr. vol. VI, 1156, 1158-59, 1167.

---

[2] Judge Black replaced Judge Elliott prior to trial. O.R. V at 941.

Petitioner challenged the limitation of mitigation evidence on direct appeal. *Cuesta-Rodriguez*, 241 P.3d at 239. Although Petitioner waived the evidentiary challenge by not raising the issue or making an offer of proof at trial, the OCCA addressed the claim on its merits. *Id*. at 240. The OCCA held that since Dr. Hamm testified extensively to the cultural and historical context that applied to Petitioner, and Petitioner never identified specific testimony that Dr. Hamm would have provided but for the pretrial ruling, the evidentiary rulings did not prevent the jury from considering Petitioner's mitigating evidence. *Id*.

### 1.    *Clearly Established Law.*

Courts must allow sentencers to consider "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The mechanistic application of state evidence rules cannot shield sentencers from such mitigating evidence. *See Green v. Georgia*, 442 U.S. 95, 97 (1979).

The Supreme Court addressed the constitutionally of state evidentiary limitations in capital trials in *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Chambers*, the defense called a witness at trial who had previously told three different people that he committed the crime at issue, and wrote out a confession to the crime as well. 410 U.S. at 289-91. The witness repudiated his confession on the stand. *Id*. at 291. The trial court, citing state evidence rules, did not allow the defendant to impeach the witness or to present the

14

statements of the three people to whom the witness confessed. *Id*. at 292. The Supreme Court ruled that the exclusion of the evidence, coupled with the defendant's inability to cross-examine the witness, violated due process, particularly since the statements "bore persuasive assurances of trustworthiness" and were "critical to [the defendant's] defense." *Id*. at 302. The Supreme Court explicitly noted that "in reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id*.

Subsequent Supreme Court decisions have characterized *Chambers* as "an exercise in highly case-specific error correction," and that "the holding–if one can be discerned from such a fact-intensive case–is certainly not that a defendant is denied a 'fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." *Montana v. Egelhoff*, 518 U.S. 37, 52-53 (1996). The Supreme Court echoed this sentiment in *United States v. Scheffer*, where a defendant challenged a military rule of evidence which categorically excluded testimony regarding polygraph examinations. 523 U.S. 303, 306-08, 316 (1998). The Supreme Court held that, unlike *Chambers*, the rule of evidence at issue did not implicate any significant interest of the defendant or undermine a fundamental element of the defense. *Id*. at 315-17. Instead, the

rule only prevented the defendant from presenting "expert opinion testimony to bolster his own credibility." *Id*. at 317. As such, the evidentiary restriction was not unconstitutional.

Oklahoma's evidence rules apply in full force at the penalty stage, although "due process may sometimes command the relaxation of state evidentiary rules that exclude highly probative evidence and render the trial fundamentally unfair." *Banks v. Workman*, 692 F.3d 1133, 1143 (10th Cir. 2012). The Tenth Circuit has traditionally navigated that dichotomy by examining the reliability and relevance of the evidence at issue.

*Paxton v. Ward* illustrates the Tenth Circuit's approach. 199 F.3d 1197 (10th Cir. 1999). The prosecution in *Paxton* introduced, in the penalty stage, evidence that the defendant had been previously charged with the shooting death of his wife to support the continuing threat aggravating circumstance. *Id*. at 1203, 1212. The defendant sought to introduce an order of dismissal which stated that a polygraph test cleared him of the charge. *Id*. at 1212. The trial judge excluded the order based on a state law prohibiting admission of polygraph results. *Id*. at 1211. During closing, the prosecutor then told the jury that if the defendant had evidence that he did not commit that previous shooting, he could have presented that evidence, and stated that "[w]e don't know why [the previous charge] was dismissed." *Id*. at 1212-13.

The Tenth Circuit found that the excluded evidence was highly relevant, and that the State obviously considered the polygraph evidence reliable enough to dismiss earlier charges

against the defendant. *Id*. at 1214. The Tenth Circuit also recognized that the prosecutor's deceitful closing arguments exacerbated the error. *Id*. at 1216. In that context, the Tenth Circuit concluded that the mechanistic operation of the state rule violated the defendant's right to present mitigating evidence. *Id*. The Tenth Circuit distinguished *Scheffer*, observing that the evidentiary rule in *Scheffer* did not implicate any significant interest of the defendant, did not significantly impair the defense, and did not prevent the defendant from presenting relevant details of the defense. *Id*. at 1215 & n.9.

*Lockett, Chambers*, and *Paxton*[3] show that a capital defendant has the right to present critical, relevant, mitigation evidence, as long as that evidence is sufficiently reliable. This Court examines Petitioner's claims in that context.

## 2. *Excluded Evidence.*

Petitioner claims that the trial court excluded evidence regarding: (1) "how the political and social conditions in Cuba affected [Petitioner] and his family personally;" (2) "[Petitioner's] reasons for leaving Cuba;" (3) "conditions and events [Petitioner] was exposed to" while in prison; and (4) evidence lending credibility to the family members' statements. Petition at 17. After careful review, it is clear that the jury heard practically all of the evidence that Petitioner claims was excluded.

---

[3]The Tenth Circuit's decisions do not define clearly established law for habeas purposes. *Parker v. Matthews*, 135 S. Ct. 429, 421 (2014). But the Tenth Circuit's rulings are helpful in identifying clearly established law.

a.      *Political and social conditions.*

Petitioner's mother testified to his impoverished upbringing and turbulent childhood in Cuba.  Trial Tr. vol. VI, 1112-14. Petitioner's brother Joaquin discussed the political conditions that launched the Mariel Boatlift, including the occupation of the Peruvian embassy.  Joaquin Cuesta-Rodriguez Interview, Def's Ex. 169.[4]  Petitioner's Aunt Ara Rodriguez described the political and social conditions surrounding the boatlift.  Trial Tr. vol. VI, 1040-44.  Dr. Hamm could not have added any details that were not presented through those witnesses.  Petitioner does not point this Court to anything other than vague generalities regarding what evidence Dr. Hamm would have given absent the pretrial ruling.

b.      *Reasons for leaving Cuba.*

The jury knew why Petitioner left Cuba. His wife's deposition revealed that Petitioner left for America to provide for her and their son, and that he intended to bring them to America.  Trial Tr. vol. VI, 1186.  Dr. Choca confirmed that intention, but explained how Petitioner's criminal conviction ended that plan.  Trial Tr. vol. V, 988.  Again, Dr. Hamm's testimony on that subject would merely amount to a second-hand repetition of evidence already in the record.

---

[4]Joaquin's testimony, as well as testimony from other members of Petitioner's family, was presented to the jury through a dvd recording.  Joaquin heard and answered questions through an interpreter.   The dvd was played during the penalty stage.  Trial Tr. vol. VII, 1240.

c.  *Conditions in prison.*

While Petitioner claims that Dr. Hamm could have spoken to the conditions at the Atlanta federal penitentiary if Dr. Hamm had access to Petitioner's INS records, he does not explain what additional details those records could have provided.  Petition at 17.  Dr. Choca testified that Petitioner was incarcerated at the Atlanta penitentiary from 1983 to March of 1988, and that Petitioner described that period as the worst time in his life.  Trial Tr. vol. V, 988-89.  Letters from Petitioner corroborated that testimony.  Trial Tr. vol. VII, 1227-36. Dr. Hamm described the conditions at the Atlanta facility during the time of Petitioner's incarceration, and detailed how the Cubans in custody took control of the facility after a riot in 1987.  Trial Tr. vol. VI, 1137-40.  Finally, Dr. Hamm testified to how the riot ended and Cuban prisoners were released.  *Id*. at 1152-53.  Dr. Hamm opined that if Petitioner was released to a halfway house and then to the general population within six months after the riot ended--which he was--it would indicate that he was deemed a good parole risk.  *Id*. at 1155-56.  At trial, the court only excluded a comparison of the Atlanta riot to other unrelated prison riots, a largely irrelevant piece of testimony.  *Id*. at 1143-44.

d.  *Credibility about conditions.*

Petitioner claims that Dr. Hamm's testimony would have lent credibility to the witness statements regarding the conditions in Cuba that led to the boatlift, the events at the Peruvian Embassy, and details about the boatlift.  Petition at 17-18.  Besides the fact that the

19

prosecution never challenged Petitioner's family's credibility, the record shows that Dr. Hamm's testimony *did* lend an air of credibility. Petitioner's brother Joaquin's statements about the events at the Peruvian Embassy and Petitioner's Aunt Ara's description of the boatlift meshed seamlessly with Dr. Hamm's description. It is unlikely that the jury missed the obvious consistency between Dr. Hamm's general testimony and the family's accounts.

### 3.   *Analysis.*

The jury heard extensive evidence of the environment in which Petitioner lived. The consistency and connection of the evidence was obvious. Unlike the situation in *Paxton*, where the rule of evidence effectively gagged the defendant, Petitioner only complains that the trial court did not allow his expert to recite testimony already in evidence.

This Court finds *Scheffer* persuasive. Although the Tenth Circuit observed in *Paxton* that *Scheffer* did not specifically deal with the "weighty interest" of mitigation evidence in a capital trial, *Scheffer* still provides guiding principles in this case. *Paxton*, 199 F.3d at 1215. As in *Scheffer*, the trial court's ruling "did not prevent the defendant from presenting relevant details of the defense from the defendant's perspective." *Paxton*, 199 F.3d at 1215 n.9 (citing *Scheffer*, 523 U.S. at 317). The trial court's ruling did not undermine the fundamental elements of Petitioner's defense; it simply prevented cumulative repetition.

The prosecution's actions during Dr. Hamm's testimony do not alter this conclusion. The prosecution objected to the relevance of Dr. Hamm's comparison of prison riots and to

Dr. Hamm's discussion about his representation of Cuban prisoners in Terra Haute, Indiana. Trial Tr. vol. VI, 1142-44, 1153-55. Both subjects were well-removed from Petitioner's situation. And the prosecutor's questions actually helped Petitioner's mitigation case. A prosecutor asked if any of the general testimony applied to Petitioner, and Dr. Hamm replied:

> If he is a Mariel Cuban, then he is part of that pattern, then he was – that was part of his story. If he was a Mariel Cuban, if he came to this country under those conditions, then those are larger sociological issues that could relate to him.

> And certainly if he was incarcerated at Atlanta, he was incarcerated under the same conditions that the Castenmeyer report showed, and in those—outlining those conditions of four to a cellhouse and all of the other social problems.

> And if he was a prisoner at Atlanta during the disturbance, then to the extent what I've said may certainly have some bearing on him.

*Id*. at 1158-59.

These questions allowed Dr. Hamm to bridge the gap between his general testimony and Petitioner's personal experiences. The prosecutor did not object or try to cut off the answer. Unlike the prosecutor in *Paxton*, who lied to the jury about the previously dismissed charge, the prosecutors in Petitioner's case lodged reasonable relevance objections and asked basic cross-examination questions. Those actions did not transform the pretrial ruling into a constitutional violation.

Dr. Hamm presented extensive mitigation evidence regarding the cultural and political climate in which Petitioner lived. Because Petitioner fails to show that the trial court excluded any evidence critical to his case, or that the prosecutor's actions prevented the jury from considering his mitigation evidence, Petitioner fails to show that the OCCA's decision

was unreasonable in light of Supreme Court precedents.  Relief is denied as to Ground Two.

**C.      Ground Three:  Prosecutorial Misconduct.**

Petitioner claims that several prosecution questions and comments rendered his penalty stage unfair.  Petitioner cites identifies the following instances:

•      A defense witness testified to Petitioner's voluntary participation in a behavior modification program.  On cross-examination, a prosecutor asked "Do you make allowances for the fact that his lawyers told him [Petitioner] to participate in the program?" Petition at 22.  After defense counsel objected, the prosecutor asked, "[s]o do you make allowance for the fact that this defendant's lawyers or any defendant's lawyers tell them to participate in this program so they can come in and present that to a Court or to a jury?"  *Id*.

•      Dr. Hamm testified generally regarding Cuba, the Mariel Boatlift, and Mariel Cubans in America. On cross-examination, a prosecutor asked "Professor Hamm, with all due respect to your scholarship on this issue, what does any of this that you've testified to have to do with [Petitioner] shooting Olimpia Fisher in both eyes with a shotgun in 2003?"  *Id*. at 23.

•      In closing, a prosecutor said he would "try and give us a little reality check here. They spent the last three days hoping you'll forget what happened to Olimpia Fisher." *Id*. at 24; Trial Tr. vol. VII, 1270.

•      In closing, a prosecutor referenced the pleas for mercy by Petitioner's family and said "shame on him for putting them in that position.  Shame on him for making them act as a human shield between justice and himself."  Another prosecutor, in second closing, said "shame on him.  He puts those people in a terrible position."  Petition at 25.

•      In closing, prosecutors suggested that evidence was only mitigating if it reduced the moral culpability or blame for the crime.  *Id*. at 26.

•      In closing, a prosecutor called the mitigation case a "guilt trip," and told the jury not to "feel guilty about doing your job," or "feel guilty if you're sitting on this jury; you're doing your civic duty."  *Id*. at 26-27.

- In closing, prosecutors appealed to "nationalistic chauvinism" by arguing that America had been good to the Cubans, but that Petitioner, a Cuban, had repaid that goodness by breaking the law. *Id*. at 45-46.

On direct appeal, the OCCA reviewed these claims, except for the "nationalistic chauvinism" comments, and held that all but one group of statements were appropriate. *Cuesta-Rodriguez*, 241 P.3d at 243-44. The OCCA determined that the "guilt trip" comments improperly denigrated Petitioner's mitigating evidence, and the other references to "feeling guilty" were "very close to crossing the line." *Id*. at 244. But the OCCA concluded that the improper comments were harmless. *Id*. After filing this petition, Petitioner sought successive post-conviction relief on his "nationalistic chauvinism" claim, and the OCCA denied it as procedurally barred. *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 4.

### 1. *Procedural Default: Nationalistic Chauvinism Claim*

Federal courts cannot ordinarily consider claims on habeas review when the state court barred those claims pursuant to an independent and adequate state procedural rule. *Coleman* 501 U.S. at 750. A petitioner can only overcome the procedural bar by demonstrating either (1) cause for the default and actual prejudice stemming from an alleged violation of federal law, or (2) that the federal court's failure to consider the matter would result in a fundamental miscarriage of justice. *Id*.

23

Petitioner did not present his "nationalistic chauvinism" claim to the OCCA until his second post-conviction application. The OCCA denied the claim as barred by OKLA. STAT. tit. 22, § 1089(D). *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 4. Petitioner claims that the procedural bar is not independent and adequate, and that he can show cause and prejudice to excuse the default.[5]

A procedural bar is only adequate if it is "strictly or regularly followed and applied evenhandedly to all similar claims. *Fairchild v. Workman*, 579 F.3d 1134, 1141 (10th Cir. 2009) (internal quotation marks omitted). The bar is independent if "it relies on state law, rather than federal law, as the basis for the decision." *Banks*, 692 F.3d at 1145. Petitioner attacks the independence and adequacy of Oklahoma's procedural bar based on *Valdez v. Oklahoma*, 46 P.3d 703 (Okla. Crim. App. 2002). Petition at 93-95. Petitioner claims that since *Valdez* gives the OCCA discretion to decide whether to apply the procedural bar, the OCCA necessarily considers the underlying merits of any federal claims when exercising that discretion. *Id*. at 94. Petitioner also argues that this discretion causes the bar to be applied inconsistently. *Id*. at 95. The Tenth Circuit has rejected this specific argument several times in recent years. *See Fairchild v. Trammell*, 784 F.3d 702, 719 (10th Cir. 2015); *Banks*, 692 F.3d at 1145-46; *Thacker v. Workman*, 678 F.3d 820, 835-36 (10th Cir. 2012). Oklahoma's procedures are adequate, and the OCCA explicitly based its rejection of Petitioner's claim

---

[5]Petitioner does not allege that this claim threatens a fundamental miscarriage of justice.

solely on the state procedural default rule. Petitioner's recitation of the oft-rejected *Valdez* argument does not persuade this Court to second-guess Oklahoma's procedural bar.

Petitioner also claims that his appellate counsel's ineffectiveness excuses the default. Petition at 95, 97. Ineffective assistance of counsel can only serve as cause if the defendant raised that ineffective assistance claim in state court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). As Respondent asserts, the record reflects (and Petitioner has not refuted), Petitioner never raised an appellate ineffectiveness claim in state court related to his "nationalistic chauvinism" claim.[6] Response at 9. Thus, under *Edwards*, appellate ineffectiveness cannot serve as cause to excuse the default of that claim. The "nationalistic chauvinism" claim is therefore denied as procedurally barred.

## 2. *Clearly Established Law.*

Prosecutors can litigate with earnestness and vigor, and are allowed to strike hard blows. *Berger v. United States*, 295 U.S. 78, 88 (1935). But prosecutors may not strike foul blows. *Id*. The line between hard and foul is an uncertain one, and even the Supreme Court has admitted that "there is often a gray zone." *United States v. Young*, 470 U.S. 1, 8 (1985). To resolve prosecutorial misconduct claims, courts must first determine whether misconduct even occurred.

---

[6]Petitioner did raise ineffective-assistance-of-appellate-counsel claims in his second post-conviction, but those claims were based solely on the failure to raise ineffective-assistance-of-trial-counsel claims, not failure to raise prosecutorial misconduct claims. *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 5.

If prosecutorial misconduct occurred, it ordinarily warrants habeas relief only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002). This analysis considers the trial as a whole, and factors in the strength of the evidence, cautionary steps to counteract improper remarks, and defense counsel's failure to object. *Le*, 311 F.3d at 1013. The determination of whether the misconduct rendered the trial fundamentally unfair "essentially duplicate[s] the function of harmless-error review." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). If the misconduct deprives a defendant of a specific constitutional right, however, proof that the entire proceeding was unfair may not be necessary. *Paxton*, 199 F.3d at 1218.

### 3. *Analysis.*

Of the non-defaulted comments or questions, the OCCA found all were proper, except the comments referencing a "guilt trip." *Cuesta-Rodriguez*, 241 P.3d at 243-44. The OCCA found those comments improper but harmless. *Id*. These determinations were not unreasonable.

### a. *Questions posed to Ms. Rote.*

Petitioner primarily complains that the prosecutor's questions to Ms. Rote implied unethical behavior by defense counsel. Petition at 22-23. While Petitioner is correct that

prosecutors should refrain from attacks on defense counsel's ethics and integrity, the questions at issue do not cross that line.

Petitioner cites *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005), in support of his argument. But *Holmes* dealt with a prosecutor's accusation that the defense counsel was "conspiring with the defendant to fabricate testimony." 413 F.3d at 775. Here, the prosecutor's questions to Ms. Rote did not imply that defense counsel fabricated the testimony. The prosecutor did not question whether Petitioner actually participated in the program. The questions also did not imply unethical or dishonest behavior. Encouraging a client to participate in a reformatory program, even if only to play well to a jury, is not unethical. Presenting the client to the jury in the best possible light is expected. Not doing so is bad lawyering.

In any event, the prosecutor's questions did not actually focus on defense counsel's actions, but on Petitioner's underlying motives for participating in the program. Petitioner offered Ms. Rote's testimony as mitigating evidence that showed growth and responsibility. Seeking to weaken that evidence by attacking Petitioner's motivations is entirely within the realm of proper trial advocacy.

b.       *Question posed to Dr. Hamm.*

Petitioner claims the prosecution deprived him of the specific right to present mitigating evidence by asking Dr. Hamm how his testimony was relevant to Olimpia Fisher's

murder. Petition at 23-24. Petitioner argues that the prosecution exploited Judge Elliott's pretrial ruling and prevented the jury from considering Dr. Hamm's testimony. *Id.*

As discussed in Ground Two, Dr. Hamm testified at length during the mitigation presentation regarding the social and political conditions of Cuba and the boatlift. The prosecutor asked how this social history mitigated Petitioner's moral culpability. The prosecutor's question, while blunt, was fair. The defense proffered Dr. Hamm's testimony to convince the jury not to sentence Petitioner to death, and the prosecutor's question challenged the weight of Dr. Hamm's mitigation evidence in light of Fisher's murder. The jury would later have to weigh the mitigating evidence against the aggravating circumstances when deliberating. Instead of improperly suggesting that the jury ignore Dr. Hamm's testimony, the question only minimized the testimony in relation to the details of the murder. Minimizing opposing evidence is a proper and normal trial practice, fairminded jurors would not be in universal agreement that the prosecutors in this case crossed the line.

c.     *"Reality check" comments in closing argument.*

Petitioner claims that the prosecutor's promise to provide a "reality check," and suggestion that "[the defense] spent the last three days hoping you'll forget what happened to Olimpia Fisher" were improper because they "encourage[d] the jury to focus on the conduct and role of the defense attorney rather than on the evidence." Petition at 24-25.

Those comments fairly tried to refocus the jury on the crime and attacked the persuasive value of the mitigation evidence, not defense counsel.

Petitioner's reference to *Holmes* and improper "red herring" and "smoke-screen arguments" do not alter the analysis. *Holmes* involved accusations that the defense fabricated testimony to distract the jury. 413 F.3d at 775. That type of argument is not harmful because it suggests that a party is trying to focus the jury on that party's perspective. It is harmful because it accuses the party of doing so in an unethical and dishonest way. Trying to convince the jury to see the case from one side's perspective is simply trial litigation. It was not unreasonable for the OCCA to conclude that the prosecutor's comments were proper.

d.     *Comments criticizing the use of family pleas for mercy.*

Petitioner complains that the prosecutors rendered the trial unfair by suggesting it was shameful of Petitioner to have his family tearfully plead for mercy. Petition at 25-26. He argues that the inflammatory comments prevented the jury from giving adequate consideration to the family's statements. *Id*.

These comments may reside within the "gray zone" between the acceptable and the improper. The prosecutors drifted close to relaying their opinion, as opposed to fairly commenting on the evidence. Respondent argues that the comments were proper because such pleas for mercy are inadmissible. Response at 59. But even if the information were

both irrelevant and inadmissible, that infirmity does not give prosecutors *carte blanche* to argue their opinion or behave improperly. Still, even though the "shame" comments may have inched close to improper argument, this Court cannot say that the OCCA's conclusion was contrary to or an unreasonable application of federal law.

e. *Comments regarding the definition of mitigating evidence.*

Petitioner claims that prosecutors improperly exploited the jury instruction which defined mitigating circumstances by arguing that evidence was only mitigating if it reduced the moral capability or blame of the crime. Petition at 26. Having reviewed the comments that Petitioner cites, this Court finds that none improperly exploited the jury instruction. The prosecutors minimized the mitigation evidence, but did not encourage the jury to disregard it. In fact, the prosecutors went through the mitigating evidence in detail, and encouraged the jury to consider and even "embrace" that evidence. Trial Tr. vol. VII, 1282-1284, 1315. The Court expands on the prosecutor's comments further in relation to Ground Four, which challenges the instruction itself. *Infra* pp. 34-35. In light of the instructions given and the prosecutor's actual comments, this Court cannot conclude that those comments prevented the jury from considering the mitigating evidence or misled them as to what they could or could not consider.

f.    *"Guilt trip" comments.*

The OCCA did find that the prosecution improperly denigrated the mitigation case by calling it a "guilt trip." *Cuesta-Rodriguez*, 241 P.3d at 244.  But the OCCA still found the comments harmless, given the strength of the prosecution's evidence supporting the death penalty.  Upon review of the complete trial, including the three-day penalty stage, the Court finds that the prosecutor's comments did not infect the entire proceedings in a way that rendered the trial fundamentally unfair. *Le*, 311 F.3d at 1013.  The prosecution presented strong evidence to support both the guilty verdict and the death sentence.  The fleeting improper remarks in closing did not undermine entire trial's fairness.

The OCCA's ruling that all but one of the challenged instances were proper is not contrary to, or an unreasonable application of clearly established Supreme Court law.  Neither is the OCCA's determination that the prosecutor's improper "guilt trip" comments were harmless.  The remaining "nationalistic chauvinism" claim is procedurally barred.  Relief is denied as to Ground Three.

**D.    Ground Four:  Challenge to Jury Instruction 9.**

Petitioner claims that Jury Instruction 9, which provides the definition of mitigating circumstances, can lead juries to ignore mitigating evidence.  Petition at 33.  Petitioner also argues that the prosecutors misused the instruction and amplified the infirmity in his case.

*Id.* at 35.  This Court addressed the propriety of those comments in Ground Four.  *Supra* p. 30.  The instruction at issue states:

> Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame.  The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

> While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least one aggravating circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required.  In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.

O.R. VII at 1284.

Petitioner raised this claim to the OCCA on direct appeal.[7]  The OCCA found that the instructions did not foreclose consideration of mitigating circumstances, and that instead of telling the jury to categorically disregard mitigating evidence, the prosecutors properly argued that the mitigating evidence "did not support an inference of reduced culpability." *Cuesta-Rodriguez*, 241 P.3d at 242-43.

### 1.    *Clearly Established Law.*

Capital defendants are entitled to have their sentencer consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

---

[7] Petitioner also claimed on direct appeal that Instructions 9 and 10 were contradictory and confusing. *Cuesta-Rodriguez*, 241 P.3d at 242.  He does not raise that argument here.

When a petitioner claims that faulty jury instructions impeded that right, courts must ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). If there is no such likelihood, the capital sentencing proceeding is not inconsistent with the Eighth Amendment. *Id*.

Courts cannot judge instructions "in artificial isolation," but must view them "in the context of the overall charge . . . ." *Id*. at 378 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). The Supreme Court has acknowledged a general rule that when (1) a jury hears mitigating evidence, (2) the court instructs the jury to consider all the evidence presented, and (3) the parties address the mitigating evidence in their closing arguments, the jury "is not reasonably likely to believe itself barred from considering the defense's evidence as a factor extenuating the gravity of the crime." *Ayers v. Belmontes*, 549 U.S. 7, 24 (2007) (internal quotations and bracketing omitted).

The Tenth Circuit recently addressed a similar habeas challenge to this jury instruction in *Hanson v. Sherrod*, 797 F.3d 810, 849 (10th Cir. 2015). The petitioner in *Hanson* alleged that the jury instruction precluded the jury from considering all mitigating circumstances and that the prosecution "manipulated the instruction," causing the jury to disregard mitigating evidence. *Id*. at 849-50. The Tenth Circuit rejected the claims for three reasons. First, the challenged instruction also allowed the jury to resolve what circumstances were mitigating, which "broadened any potential limitations imposed by the first sentence of the instruction."

*Id*. at 851.  Second, the next instruction enumerated specific mitigating circumstances, some of which were unrelated to the petitioner's moral culpability.  *Id*.  The next instruction also stated that the jury could decide that other mitigating circumstances existed, and that they should consider those circumstances as well.  *Id*.  Finally, while the prosecutor did tell the jury to consider whether the circumstances "really extenuate or reduce [petitioner's] degree of culpability or blame in this case," he also "encouraged [the jury] to consider any and all mitigating evidence they thought relevant."  *Id*.  The Tenth Circuit concluded that "in light of all of the instructions and of the prosecutor's various comments, we find it hard to imagine that the jurors thought they were prohibited from considering any of the mitigating evidence they heard at the resentencing hearing."  *Id*. at 852.

## 2. *Analysis.*

Petitioner fails to show that the instructions given combined with the prosecutors' comments create a reasonable likelihood that the jury in his case applied the challenged instruction in a way that prevented them from considering his mitigating circumstances.

Three of the penalty stage instructions support this conclusion.  First, just as in *Hanson*, Jury Instruction 9 broadened the universe of mitigating circumstances by informing the jury that they determined what circumstances were mitigating.  O.R. VII at 1284.  Second, Jury Instruction 10 listed sixteen specific mitigating circumstances for the jury to consider, many of which would not necessarily relate to Petitioner's moral culpability.  *Id*.

at 1285-88. Yet the end of the instruction provided that if the jury found any other mitigating circumstances, they should consider those circumstances "*as well.*" *Id*. at 1288. Jury Instruction 10 also told the jury to consider all the enumerated circumstances and any others they decided existed. Finally, Instruction 16 specifically allowed the jury to consider "sympathy or sentiment for the defendant in deciding whether to impose the death penalty." *Id*. at 1295. This instruction gave the jury discretion to give effect to *any* evidence presented, even if its only value was to engender sympathy or sentiment. These instructions, taken as a whole, make it highly unlikely that the jury viewed the three days of mitigating evidence as a meaningless charade.[8]

The prosecutors' comments in this case do not increase the likelihood that the jury misapplied the instruction. In fact, the arguments are almost identical to those challenged in *Hanson*. And just as in *Hanson*, prosecutors encouraged the jury to consider all of the mitigating evidence. Prosecutors referred to the "evidence we've heard," and reminded the jury to "consider what [Petitioner's family members] have to say." Trial Tr. vol. VII, 1281, 1284. The prosecutor urged the jury to "weigh all of this." *Id*. at 1286. During second closing, the other prosecutor told the jury not to "ignore the evidence, but embrace it." *Id*. at 1315. Defense counsel also discussed the mitigating evidence in detail, and pointed out

---

[8] Petitioner offers *Harris v. Oklahoma*, 164 P.3d 1103 (Okla. Crim. App. 2007), as evidence that Jury Instruction 9 is faulty on its face. In *Harris*, the OCCA noted that this jury instruction was vulnerable to prosecutorial abuse, and recommended changes to the instruction. 164 P.3d at 1114. But the OCCA explicitly stated in *Harris* that the instruction was not constitutionally infirm. *Id*. *Harris* does not lend any weight to Petitioner's argument.

that the jury could consider sympathy in deciding against the death penalty. *Id*. at 1301. The closing arguments reveal that the jury was repeatedly instructed to consider all of the evidence, including the mitigating circumstances.

In Petitioner's case, "[t]he jury heard mitigating evidence, the trial court directed the jury to consider all the evidence presented, and the parties addressed the mitigating evidence in their closing arguments." *Ayers*, 549 U.S. at 24. The OCCA was therefore not unreasonable in concluding that Instruction 9 and the prosecutors' arguments regarding the instruction did not prevent the jury from considering Petitioner's mitigating evidence. Relief is denied as to Ground Four.

## E. Ground Five: Ineffective Assistance of Trial Counsel.

Petitioner alleges that trial counsel was ineffective for several reasons. Petition at 39-67. However, the OCCA only reviewed one of these claims on the merits. Petitioner did not raise any ineffective-assistance-of-counsel claims on direct appeal, and only raised one ineffective-assistance-of-counsel claim in his initial post-conviction application. *Cuesta-Rodriguez*, No. PCD-2007-1191, slip op. at 3. In that claim, Petitioner argued that trial counsel was ineffective because they did not locate, interview, and present Enrique Valles during the penalty stage. *Id*. The OCCA reviewed that ineffectiveness claim on the merits, and denied relief. *Id*. at 9. Petitioner did not present his remaining claims to the OCCA until Petitioner's second post-conviction application, which he filed after the filing of the petition

in this case. The OCCA found the claims procedurally barred. *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 3-4.

1. ***Clearly Established Law.***

An attorney's performance in a capital case only warrants reversal of the conviction or death sentence if (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On habeas review, courts must apply the highly deferential standards of *Strickland* and the AEDPA to the facts of the case. The standard is whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105. Put simply, this Court cannot disturb the OCCA's denial of a *Strickland* claim unless Petitioner demonstrates that OCCA applied the highly deferential *Strickland* test in a way that every fair minded jurist would agree was incorrect. *Richter*, 562 U.S. at 101, 105.

3. ***Analysis.***

This Court finds, after a careful review of the briefs and the record, that Petitioner fails to show either deficient performance or actual prejudice from the failure to call Enrique Valles in mitigation.

       a.    *Deficient performance*.

The Supreme Court has shunned "specific guidelines," as to what constitutes deficient performance, and instead held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The reasonable inquiry depends on the facts of the particular case. *Id*. at 690. To avoid the "distorting effects of hindsight," the conduct should be judged "as of the time of counsel's conduct." *Id*. at 689-90. This Court "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id*. at 689.

Petitioner complains that trial counsel did not locate, interview, prepare, and present Valles as a mitigation witness. Petitioner does not claim that trial counsel knew exactly how to reach Valles and made the conscious decision not to interview or call him as a witness, but rather that trial counsel did not conduct a thorough investigation regarding Valles' whereabouts and his value to the mitigation case. Petition at 63. The claim is similar to the defendant's claim in *Wiggins v. Smith*: that counsel conducted an inadequate or less-than-complete investigation into mitigating circumstances. 539 U.S. 510, 523 (2003).

The Supreme Court has referenced the American Bar Association Standards for Criminal Justice as a guide for determining the reasonableness of an investigation. *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 524. The standards provide that investigations should "comprise efforts to discover all reasonably available mitigating evidence . . . ." *Wiggins*, 539 U.S. at 524 (quoting 1989 version of ABA guidelines). The guidelines list medical history, educational history, employment and training history, family

38

and social history, prior adult and juvenile correctional experience, and religious and cultural influences as topics that trial counsel should investigate. *Id*. These guidelines are "'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009). They are certainly not "inexorable commands with which all capital defense counsel 'must fully comply.'" *Id*. In this case, Court is confident that trial counsel conducted a reasonable investigation by any prevailing norms, including those guidelines.

Petitioner concedes that trial counsel went to great lengths to secure mitigation evidence. Petition at 39. Those efforts included traveling to Cuba with an interpreter, conducting interviews and depositions,[9] bringing Petitioner's aunts from Miami to testify, and consulting with medical and historical experts. *Id*. These efforts alone distinguish Petitioner's representation from the deficient performance in his cited cases, where attorneys performed little to no investigation.

Trial counsel investigated and presented Petitioner's medical and psychiatric history through Dr. Choca. He testified to Petitioner's childhood head injury and a back injury sustained as an adult. Trial Tr. vol. V, 982-83. He also testified regarding Petitioner's mental health, including his struggle with depression and substance abuse. *Id*. at 984. Trial counsel even attempted to obtain medical background information from a hospital in Cuba (presumably the hospital in which Petitioner was treated). Trial Tr. vol. VI, 1104.

---

[9] Petitioner complains about the arrangement for depositions, but that deficiency lies with the social and governmental restraints in Cuba, not with trial counsel.

Trial counsel investigated Petitioner's social and family history, and presented live testimony through two of Petitioner's aunts and video testimony from Petitioner's brother and son. *Id*. at 1038, 1051; Trial Tr. vol. VII, 1240, 1242. Trial counsel offered deposition statements from Petitioner's mother, sister, and ex-wife. Trial Tr. vol. VI, 1111, 1173, 1184. Dr. Choca testified to Petitioner's social and family history. Trial Tr. vol. V 985-991. Dr. Hamm gave a detailed account as to the social and political conditions in Cuba, and the conditions faced by the Mariel Cubans in America. Trial. Tr. vol.VI, 1118-1171. Dr. Choca and Petitioner's sister provided evidence as to Petitioner's employment and educational history. Trial Tr. vol. V, at 987, 991; Trial Tr. vol. VI, 1178-79. Dr. Choca gave Petitioner's criminal and incarceration history. Trial Tr. vol. V, 987-89.

Trial counsel conducted a thorough investigation that led to mitigating evidence related to a broad range of topics. The close correlation between the mitigation evidence presented and the ABA guidelines, while not dispositive, certainly indicates reasonable performance. Fairminded jurors would not all agree that trial counsel's failure to interview or call one specific family member rendered trial counsel's performance unreasonable under *Strickland*. The OCCA's decision was therefore not contrary to or an unreasonable application of *Strickland*.

b, *Actual prejudice*.

Deficient performance only warrants reversal of a conviction or sentence if the defendant affirmatively proves "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In Oklahoma, where the jury can only impose a death sentence unanimously, the question is whether there exists a reasonable possibility that "at least one juror would have struck a different balance but for [defense] counsel's putative misconduct." *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009). When evaluating the evidence, courts will consider not only the benefits of the additional information, but the negative effects as well. *Id*. at 1178.

Other witnesses testified at trial to Petitioner's impoverished childhood and abusive surroundings. *Supra* pp. 18-19. Taking all facts in Valles' affidavits at face value, Valles does not offer a significant amount of additional information.[10] Valles provides the following: Petitioner had little supervision, and was allowed to generally roam the streets. Petition, Exhibit 8 at 2. People in the neighborhood had to be careful because government snitches in the neighborhood had at one point turned in one of their friends for smoking marijuana. *Id*. Petitioner began abusing drugs and alcohol at age 11 or 12. *Id*. Petitioner sold sexual favors to men in the neighborhood in exchange for drugs. *Id*. at 2-3. Valles saw

---

[10]Petitioner only presented one of Valles' affidavits to the OCCA in his first post-conviction proceeding, when the OCCA ruled on the merits of the Valles ineffectiveness claim. The second affidavit was not presented until Petitioner's second post-conviction application. This Court is barred from considering evidence not presented to the state court under *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011). This Court need not decide whether the second affidavit can be considered, because even if both affidavits are analyzed, Petitioner is not entitled to relief.

Petitioner in Texas, and assumed that Petitioner was a junkie because he was nervous and skinny. Petition, Exhibit 3 at 2. At best, this information could add details about Petitioner's life, but would not be reasonably likely to change the outcome of the sentencing proceedings.

Considering the double-edged nature of Valles' testimony, the information is not only unhelpful to Petitioner, but potentially detrimental. While Petitioner may have been young when he sold sexual favors to men in his neighborhood, this information has a decided negative edge. Right or wrong, a jury could reasonably have a less-than-sympathetic view of a boy that engages in prostitution to fuel an addiction to drugs and alcohol. The same is true regarding Petitioner's other struggles with substance abuse. It is certainly "possible that the jury would have faulted [Petitioner] for his repeated failures to effectively address the problem." *Wackerly*, 580 F.3d at 1178. Valles' descriptions of Petitioner as a drug-dealing crack addict would have the potential to hurt Petitioner more than help him. And Valles' testimony that Petitioner carried on a homosexual relationship in Cuba while married with a child offers little redeeming value. This testimony would certainly undermine the extensive testimony that Petitioner was a loving father and husband, regardless of whether that extramarital relationship was based on affection or an addict's desire for drugs and alcohol.

Trial counsel conducted an extensive investigation which produced evidence for Petitioner's family, social, education, medical, and employment history. Valles' information offers some helpful additional information, but also carries the potential to affect a jury negatively. This Court concludes that the OCCA did not act unreasonably in determining

that trial counsel was not ineffective on the ineffectiveness claim regarding Mr. Valles.

### 3. *Procedural Default*

Petitioner raised all of his other ineffective-assistance-of-counsel claims in his second post-conviction application. *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 3. The OCCA held that these claims were procedurally barred because Petitioner should have raised them either on direct appeal or in his first post-conviction application. *Id*. at 3-4. For the following reasons, this Court cannot review these barred claims.

As noted in Ground Three, federal habeas courts cannot consider claims that are procedurally defaulted on adequate and independent state law grounds unless the petitioner demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that the failure to consider the claims will result in a fundamental miscarriage of justice. *Supra* p. 23. This Court already addressed Petitioner's independence and adequacy arguments based on *Valdez* in Ground Three. *Supra* pp. 24.[11] The Oklahoma procedural bar is adequate, and the OCCA's decision in imposing the procedural bar does not mention any consideration of federal law; it simply applied the bar under state law.

Since Petitioner does not argue that barring review of his claims would result in a

---

[11]Petitioner also raises specific concerns with the OCCA's Rule 3.11, claiming that it does not provide an adequate procedure for raising extra-record ineffectiveness claims on direct appeal. But the OCCA barred the defaulted claims because Petitioner failed to raise them in both direct appeal *and* his initial post-conviction proceeding. Any alleged inadequacy in Rule 3.11 had no effect on the defaulted claims because Petitioner did not even seek to use that procedure.

miscarriage of justice, this Court will only consider whether Petitioner has demonstrated sufficient cause and prejudice to excuse his default. Petitioner proffers the ineffective assistance of his appellate and post-conviction counsel as cause for the default of his ineffective-assistance-of-trial-counsel claims. Petition at 95-96. Neither proffered causes are valid.

Petitioner's ineffective-assistance-of-appellate-counsel claim cannot serve as cause for two reasons. First, any ineffectiveness on appellate counsel's part does not explain why the ineffectiveness claims were not raised in the initial post-conviction proceeding. That failure has no causal connection to the effectiveness or ineffectiveness of appellate counsel.

Second, the appellate ineffectiveness claim itself is procedurally defaulted, as discussed in Ground Six. *Infra*, p. 45. *Edwards v. Carpenter* clearly states that procedurally defaulted claims cannot themselves excuse other defaulted claims, absent an independent showing of cause and actual prejudice. 529 U.S. at 452-53. Petitioner does not provide any valid cause for his appellate ineffectiveness default. *Infra* p. 45. Therefore the appellate ineffectiveness claim cannot serve as cause for Petitioner's trial ineffectiveness default.

Petitioner also cannot save his defaulted trial ineffectiveness claims through an ineffective-assistance-of-post-conviction-counsel claim. Ineffective assistance of post-conviction counsel cannot serve as cause because there is no constitutional right to counsel in state post-conviction proceedings. *Coleman*, 501 U.S. at 752. The exceptions in *Martinez*

*v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), are not applicable to Petitioner, as Oklahoma law allows defendants a meaningful opportunity to raise ineffective-assistance-of-trial-counsel claims on direct appeal under OCCA Rule 3.11. *See Fairchild*, 784 F.3d at 723; *Banks*, 692 F.3d at 1148. And Petitioner's argument that he could not take advantage of the Rule 3.11 procedure because his appellate attorney "abandoned" him is unpersuasive. Petitioner's appellate attorney filed a significant appellate brief, reply brief, and a petition for rehearing. Regardless of whether Petitioner's appellate counsel was constitutionally ineffective for not raising the ineffectiveness claims, counsel clearly did not abandon him.

Petitioner only presented one non-defaulted ineffective-assistance-of-trial-counsel claim to this Court. Based on the high level of deference given to trial counsel under *Strickland*, and the similarly high level of AEDPA deference this Court gives to the OCCA's decision, this Court does not find the OCCA's ruling on that claim unreasonable. As to the remaining trial ineffectiveness claims, the OCCA barred those claims pursuant to independent and adequate state procedural rule. Petitioner fails to demonstrate sufficient cause and prejudice to excuse the procedural bar and review the merits of the defaulted claims. This Court therefore cannot review Petitioner's defaulted challenges to his trial counsel's effectiveness. Relief is denied as to all claims in Ground Five.

**F. Ground Six: Ineffective Assistance of Appellate and Post-Conviction Counsel.**

Petitioner claims that his appellate and post-conviction counsel were ineffective because they did not investigate trial counsel's performance and raise several ineffective-assistance-of-trial-counsel claims on direct appeal or in his first post-conviction application. Petition at 68-69. Petitioner raised both claims for the first time before the OCCA in his second application for post-conviction relief. *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 5-6. The OCCA held that OKLA. STAT. tit. 22, § 1089(D)(4)(b), (D)(8) barred the claim regarding appellate counsel because Petitioner failed to raise the claim in his initial post-conviction proceeding. *Id*. at 5. The OCCA barred the post-conviction ineffectiveness claim because although post-conviction counsel's alleged failings would have been apparent when the OCCA denied Petitioner's first post-conviction application, Petitioner did not file his second application within the required sixty days of that order. *Id*. at 6-7.

Petitioner's appellate ineffectiveness claim is procedurally barred. By failing to raise the ineffective-assistance-of-appellate-counsel claim in his initial post-conviction, Petitioner defaulted that claim. Petitioner does not allege any fundamental miscarriage of justice stemming from the defaulted claim, and the only cause he offers is ineffective assistance of post-conviction counsel. Because a claim of ineffective post-conviction counsel cannot serve as cause, Petitioner has no valid cause for the default. *Supra* p. 44. This Court therefore will not review the defaulted appellate ineffectiveness claim.

This Court also rejects Petitioner's ineffectiveness claim regarding post-conviction counsel. 28 U.S.C. § 2254(i) explicitly states that "ineffectiveness or incompetence of

46

counsel during Federal or State collateral post-conviction proceedings *shall not be a ground for relief in a proceeding arising under section 2254*." (emphasis added). Petitioner raises a specific claim that counsel for his state post-conviction proceeding was ineffective. This case is proceeding under Section 2254. The AEDPA bars this Court from granting relief on Petitioner's post-conviction ineffectiveness claim. Relief is denied as to Ground Six.

### G. Ground Seven: "Continuing Threat" Aggravator.

Petitioner claims that the evidence in his case was insufficient to support the "continuing threat" aggravator, and he attacks the aggravator itself as unconstitutional. Petition at 71-72. The OCCA rejected Petitioner's sufficiency challenge on direct appeal. The OCCA listed the facts supporting the continuing threat aggravator and determined that the evidence supported the jury's finding. *Cuesta-Rodriguez*, 241 P.3d at 237-38.

Petitioner relies on *Cudjo v. Oklahoma*, 925 P.2d 895 (Okla. Crim. App. 1996), to support his arguments. He claims that since the evidence in *Cudjo* was insufficient to support the continuing threat aggravator, the evidence in this case is insufficient as well. Petition at 70-71. Petitioner also compares his case to *Cudjo* to show that the OCCA applies the aggravator inconsistently, rendering the "continuing threat" aggravator unconstitutionally vague in that it results in arbitrary application. *Id*. at 72.

### 1. *Constitutionality of the Continuing Threat Aggravator.*[12]

---

[12] Petitioner did not raise this constitutional challenge in state court. This Court need not decide whether that claim is procedurally barred, because the constitutional claim is clearly foreclosed on the merits.

"[V]agueness review should be 'quite deferential' because 'mathematical precision' is not possible in the definition of aggravating factors." *United States v. McCullah*, 76 F.3d 1087, 1110 (10th Cir. 1996) (citing *Tuilaepa v. California*, 512 U.S. 967, 973 (1994)). An aggravating circumstance is only "unconstitutionally vague if it 'leave[s] the sentencer without sufficient guidance for determining the presence or absence of the factor.'" *Nguyen v. Reynolds*, 131 F.3d 1340, 1353 (10th Cir. 1997) (quoting *McCullah*, 76 F.3d at 1110). But if the circumstance has some "common-sense core meaning . . . that criminal juries should be capable of understanding," it is not unconstitutionally vague. *Tuilaepa*, 512 U.S. at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (White, J., concurring in judgment)).

Petitioner concedes that the Tenth Circuit has already found that Oklahoma's continuing threat aggravator is not vague. Petition at 72. The aggravator has "a common-sense core meaning that criminal juries are fully capable of understanding." *Nguyen*, 131 F.3d at 1354. But Petitioner argues that the OCCA's treatment of *Cudjo* compared to his case provides evidence that the aggravator is vague, considering the different results in those cases. Petition at 72. It is unclear whether Petitioner is raising a facial or as applied challenge to this aggravator. Petitioner does give obligatory references to the challenge being "as applied," but then proceeds to ask this Court to engage in a case-by-case comparison.

Case-by-case comparison is appropriate where the reviewing court is determining whether a state's formulations of limiting constructions are consistent and sufficiently

narrow, which goes to the aggravator's *facial* validity. *See Lewis v. Jeffers*, 497 U.S. 764, 779 (1990). Federal courts cannot engage in state case comparisons to determine whether the construction is applied consistently. *Arave v. Creech*, 507 U.S. 463, 477 (1993). *Cudjo* is therefore inapplicable to Petitioner's "as applied" vagueness challenge, and, the Tenth Circuit has already deemed Oklahoma's continuing threat aggravator facially valid. Petitioner's arguments do not persuade this Court to contradict those holdings.

## 2. *Sufficiency of the Evidence.*

Federal courts reviewing whether evidence supports an aggravating circumstance are not to "peer majestically over the [state] court's shoulder so that [they] might second-guess its interpretation of facts that quite reasonably-perhaps even quite plainly-fit within the statutory language." *Lewis*, 497 U.S. at 780-81 (1990) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 450 (1980)). Instead, courts must use the reasonable fact-finder standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Lewis*, 497 U.S. at 782. Courts must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found" the aggravating circumstances beyond a reasonable doubt. *LaFevers v. Gibson*, 182 F.3d 705, 723 (10th Cir. 1999) (applying the *Jackson* standard in the aggravating circumstance context).

The sufficiency question is a mixed question of law and fact, and is thus governed by 28 U.S.C § 2254(d)(1) and (d)(2). *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006). This Court must presume that the OCCA's factual determinations are correct, unless the

petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). On the legal question, this Court cannot overturn the OCCA's sufficiency determination unless that decision was objectively unreasonable. *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012). The Supreme Court has described this standard as "twice-deferential." *Id*.

The OCCA recited "criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police" as factors that generally support a finding of continuing threat, and found that Petitioner's crime met four of the five factors. *Cuesta-Rodriguez*, 241 P.3d at 237-38. The evidence in this case shows that the OCCA's decision was reasonable.[13]

### a. *Criminal history factor.*

Petitioner's criminal history included a conviction for possession of heroin for sale and an arrest for driving under the influence. *Id*. at 237. While these crimes may be non-violent, such crimes can be considered in conjunction with other factors to support the continuing threat aggravator. *See Boltz v. Mullin*, 415 F.3d 1215, 1231 (10th Cir. 2005). Also, these crimes indicate a higher level of criminality than the defendant in *Cudjo*, whose criminal history consisted of "nothing more than petty thefts." *Cudjo*, 925 P.2d at 902.

### b. *Threats and violence against others.*

---

[13] Petitioner did not challenge the OCCA's factual findings. Therefore, this Court presumes those findings to be true under 28 U.S.C. § 2254(e)(1).

Petitioner's previous girlfriend obtained a victim protective order against him because he had been drinking, angry, and violent. *Cuesta-Rodriguez*, 241 P.3d at 237. Petitioner left bruises on Olimpia Fisher's abdomen and arm just weeks prior to murdering her. *Id*. While these acts may not qualify as "threats" *per se*, this Court can hardly conclude that Petitioner's dangerousness is lessened because he actually engaged in abuse rather than just threatening it. The defendant in *Cujdo* simply said prior to the murder that if he were ever caught in the grocery store, "it would be them or him." *Cudjo*, 925 P.2d at 902. Petitioner's very real physical abuse against women certainly supported the aggravator more than the defendant's isolated threat in *Cudjo*. Petitioner's argument that he is only dangerous to women that engage in relationships with him does not change the equation. The Supreme Court has never limited the definition of "society" to just prison society, and Oklahoma courts have consistently held that "society" relates to society as a whole. *Hooker v. Oklahoma*, 887 P.2d 1351, 1365 (Okla. Crim. App. 1994).

c. *Preventing calls to the police.*

When Olimpia Fisher tried to call the police, Petitioner "snatched the telephone from her hands, threw it against the window, and shot her." *Cuesta-Rodriguez*, 241 P.3d at 237. This blatant act of cutting Fisher off from help fits squarely within the "attempts-to-prevent-calls-to-the-police" factor. Petitioner argues that the defendant *Cudjo* did the same thing by shooting his victim. Petition at 71. While murdering someone does prevent a call to the police, that argument is unsound. If murder itself supported that factor, then every murderer

could potentially meet the continuing threat aggravator. That would create a clear constitutional problem, as aggravators cannot be so broad as to apply to every single murder. Petitioner's conscious act of discarding the phone was an actual attempt at preventing a call to the police, while the prevention in *Cudjo* was the natural consequence of murder.

d. *Callousness of the crime.*

Petitioner shot Fisher in the head in the presence of her pregnant teenage daughter. *Cuesta-Rodriguez*, 241 P.3d at 238. He then carried her to his room, where she fought him and screamed desperately for help. *Id*. As police gathered outside, Petitioner shot her again. *Id*. He kept the police away from Fisher for three hours. *Id*. In contrast, the defendant in *Cudjo* shot the victim even though the victim asked the defendant not to shoot him. 925 P.2d at 901-02. While this Court will not minimize the gravity of the crime in *Cudjo*, it is abundantly clear that Petitioner's callousness far and away exceeds that of the defendant in *Cudjo*.

The OCCA found that, viewing the evidence in the light most favorable to the prosecution, that any rational factfinder could have found the continuing threat aggravator beyond a reasonable doubt. After reviewing the evidence, this Court finds the OCCA's decision was not contrary to or an unreasonable application of federal law. Relief is denied as to Ground Seven.

**H.     Ground Eight:  Voluntary Intoxication Instruction.**

Petitioner challenges the trial court's failure to instruct the jury on voluntary intoxication. Petition at 72. Petitioner points out several pieces of evidence that he claims supported the instruction. *Id*. at 73-76. When Petitioner raised this claim on direct appeal, the OCCA found that the evidence "may support an inference that [Petitioner] was intoxicated, but it does not rise to the level of making a prima facie showing that [Petitioner] was so intoxicated that he was incapable of forming criminal intent." *Cuesta-Rodriguez*, 241 P.3d at 223-24.

### 1.    *Clearly Established law.*

The Supreme Court has not recognized a free-standing constitutional right to an intoxication instruction. *Spears v. Mullin*, 343 F.3d 1215, 1244 (10th Cir. 2003). That narrows this Court's review to the question of whether the trial, viewed in context of the entire proceeding, ran afoul of fundamental fairness and due process. *Id*. In this specific context, where the court refused to give a certain instruction, Petitioner's burden is "especially great because [a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999) (quoting *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (internal quotation marks omitted)).

Oklahoma allows juries to consider voluntary intoxication as a defense when there is sufficient evidence to establish a prima facie case that the defendant was so "utterly intoxicated, that his mental powers [were] overcome, rendering it impossible for [the]

defendant to form the specific criminal intent . . . ." *Spears*, 343 F.3d at 1244 (quoting

*Toles v. Gibson*, 269 F.3d 1167, 1177 (10th Cir. 2001)); *Malone v. Oklahoma*, 168 P.3d 185,

197 n.48 (Okla. Crim. App. 2007). If a trial court determines that the evidence is insufficient

to make that showing, it can refuse to give the instruction. *Fitzgerald v. Oklahoma*, 972 P.2d

1157, 1174 (Okla. Crim. App. 1998).

### 2.    *Analysis.*

While Petitioner produced evidence that he drank in the evening before the murder,

and even that he was somewhat intoxicated, the evidence does not indicate that the lack of

a voluntary intoxication instruction infected the entire trial to the point that Petitioner's

conviction violated due process. The trial court record reveals substantial evidence that

Petitioner was not "utterly intoxicated" to the extent that he could not form specific criminal

intent.

The OCCA relied heavily on Petitioner's ability to recall the details of the murder.

This is a type of evidence that the Tenth Circuit has often relied on in similar challenges. *See*

*Bland v Sirmons*, 459 F.3d 999, 1031 (10th Cir. 2006) (OCCA's decision that defendant's

detailed recollection of the murder precluded a voluntary intoxication instruction was not

unreasonable); *Spears*, 343 F.3d at 1245 (defendant's statement detailing the murder belies

voluntary intoxication claim); *Valdez v. Ward*, 219 F.3d 1222, 1245 (10th Cir. 2000)

(defendant's description of the evening's events in explicit detail undermined the necessity

of voluntary intoxication instruction).

In an interview with detectives, Petitioner recalled several details about the murder, including the argument he had with Fisher and her daughter, specific insults they hurled at him, Fisher's position on the bed at the time of the first shot, and even the specific pocket in which he placed the gun. Petitioner Interview Tr., Ct. Ex. 4 at 12-15. Petitioner told detectives where to find the gun as well. *Id*. at 6-7. Petitioner counters that he was unsure of certain details in the interview. Petition at 78. Those details are inconsequential in light of the details he did recall.

Petitioner argues that Fisher's daughter Katya described him as "stupid drunk" and "drunk and agitated." Petition at 78. Yet Katya also denied that Petitioner was not thinking clearly, and conveyed that he was steady on his feet and responding well to her questions. Trial Tr. vol. II, 418. And while Detective Dupy described Petitioner as "slightly intoxicated" at the time of Petitioner's initial interview, that type of evidence falls well short of Oklahoma's standard.

Petitioner also stated unequivocally in the interview that while he had been drinking the evening before the murder, he was not drunk. Ct. Ex. 4, 11. Petitioner did appear unsure whether he had three or four drinks, but lack of clarity on that type of detail does not show that he was incapable of forming criminal intent. The presence of the empty tequila bottles in his home provide little information regarding Petitioner's level of intoxication, as nothing in the trial court record indicates how much tequila the bottles contained before Petitioner began drinking that night. The presence of empty bottles does not seriously contradict

55

Petitioner's own testimony that he had about three shots, but was not drunk.

Viewing the trial in context, this Court cannot say that the omission of the voluntary intoxication instruction resulted in a fundamentally unfair trial. At most, Petitioner's evidence established that he was intoxicated from a few shots of tequila at the time of the murder. Yet the evidence also shows that Petitioner possessed the mental faculties to recall the details of the evening's events with clarity. The OCCA could reasonably conclude that the evidence did not merit a voluntary intoxication instruction. This claim does not present the type of "extreme malfunction" that merits habeas relief. Relief is denied as to the Ground Eight.

## I. Ground Nine: "Other Crimes" Evidence.

Petitioner claims that Officer Jeffrey Hauck's testimony violated the Confrontation Clause, constituted inadmissible hearsay, and was improper "other crimes" evidence. Petition at 81, 83-84. The prosecution called Officer Hauck as its first witness in Petitioner's trial. *Id*. at 80. Officer Hauck testified that, eleven days before her murder, Olimpia Fisher came to the police station to report that Petitioner assaulted her. *Id*. Hauck testified to observing bruises on her body. *Id*.

Petitioner challenged Officer Hauck's testimony as improper "other crimes" evidence on direct appeal. *Cuesta-Rodriguez*, 241 P.3d at 226. The OCCA held that since the evidence was relevant to the issue of intent and motive, the trial court did not abuse its

discretion in permitting the evidence. *Id*. Petitioner did not raise the Confrontation Clause or hearsay issues before the OCCA until his second application for post-conviction relief. Petition at 86; *Cuesta-Rodriguez*, No. PCD-2012-994 at 4-5. At that point, the OCCA held that OKLA. STAT. tit. 22, § 1089(D) procedurally barred those claims. *Cuesta-Rodriguez*, No. PCD-2012-994, slip op. at 4-5.

### 1. *Procedural Default.*

This Court cannot review Petitioner's Confrontation Clause and hearsay claims. The OCCA barred those claims on adequate and independent state law grounds. *Supra* pp. 24-25. Further, ineffective assistance of Petitioner's appellate and post-conviction counsel cannot excuse the default. *Supra* pp. 25-26. This Court will focus solely on Petitioner's non-defaulted challenge to the admission of the "other crimes" evidence.

### 2. *Clearly Established Law.*

Federal habeas courts cannot review state court actions that are based on state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Federal review therefore focuses not on whether evidence was admissible under state law, but only on whether, "in light of the entire record, its admission resulted in a fundamentally unfair trial." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002). Petitioner must show that the "other crimes" evidence "[was] so unduly prejudicial that it render[ed] the trial fundamentally unfair." *See Welch v. Sirmons*,

451 F.3d 675, 687-88 (10th Cir. 2006) (overruled on other grounds) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

### 3. *Analysis.*

Oklahoma law excludes "proof that one is guilty of other offenses not connected with that for which one is on trial . . . ." *Burks v. Oklahoma*, 592 P.2d 771, 772 (Okla. Crim. App. 1979). But "other crimes" evidence is admissible to establish "absence of mistake, or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge, and identity. *Id*. The OCCA has specifically stated that evidence of previous altercations between spouses is relevant to the issue of motive, malice, and intent. *Lamb v. Oklahoma*, 767 P.2d 887, 891 (Okla. Crim. App. 1988) (citing *Villanueva v. Oklahoma*, 695 P.2d 858, 860 (Okla. Crim. App. 1985). "Other crimes" evidence must also be

> probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, and the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions.

*Lott v. Oklahoma*, 98 P.3d 318, 334-35 (Okla. Crim. App. 2004).

This Court is persuaded that the admission of "other crimes" evidence did not render Petitioner's trial fundamentally unfair for three reasons. First, evidence that Petitioner previously abused Olimpia Fisher is certainly relevant and probative to motive and intent. Petitioner concedes that some evidence at trial suggested the first gunshot was an accident.

58

Petition at 87. In closing, defense counsel described the first shot occurring as a result of a struggle, and reminded the jury that Petitioner said in the interview he did not want to shoot Fisher. Trial Tr. vol. V, 928-29. The evidence from the entire trial put the issue of motive and intent in at least some dispute. It was not fundamentally unfair to admit relevant evidence that addressed that dispute.

Second, the trial court gave a limiting instruction before Officer Hauck's testimony, and at the end of the guilt stage, telling the jury that the evidence could only be considered to determine the issue of common scheme or plan, motive, or intent. Trial Tr. vol. II, 335-36; O.R. VII at 1262. This instruction helped neutralize any danger that the jury would misuse the "other crimes" evidence.

Third, the "other crimes" evidence enjoyed sufficient factual support. Fisher came to the police station intending to file a domestic abuse report, and Officer Hauck saw her bruises. Trial Tr. vol. II, 337-38. A letter introduced at trial corroborates that Petitioner had struck Fisher in the past. Petition at 88. While Petitioner argues that Fisher's job as a mover involved minor injuries and bruising, he does not cite to any evidence in the record supporting the inference that Fisher's bruising occurred on the job. And Katya Chacon's testimony that she never *saw* Petitioner hit her mother is hardly dispositive. That leaves Petitioner's own denials as the only real evidence countering (1) Fisher's report of abuse, (2) Officer Hauck's testimony that she was bruised, and (3) a letter in which Petitioner admits

to hitting Fisher. It did not violate due process to admit "other crimes" evidence on that quantum of factual support.

The OCCA denied Petitioner's "fair trial" claim regarding the admission of "other crimes" evidence. Based on this Court's review of the record, that decision was not contrary to or an unreasonable application of clearly established Supreme Court law. Relief is denied on Ground Nine.

### J.     Ground Ten: Cumulative Error.

Petitioner claims that even if individual errors in his trial were harmless, these errors were not harmless in the aggregate. Petition at 89-90. Petitioner raised this claim on direct appeal. *Cuesta-Rodriguez*, 241 P.3d at 246. The OCCA acknowledged that Petitioner's trial was not error-free, but held that the "errors do not require relief because when considered in the aggregate, they did not render his trial fundamentally unfair, taint the jury's verdict, or render the sentencing unreliable." *Id*.

The cumulative-error analysis addresses the possibility that two or more individually harmless errors might "prejudice a defendant to the same extent as a single reversible error. *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). This analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id*. at 1470. Cumulative error only

warrants reversal if the many errors "collectively 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

The OCCA found two errors: the prosecutor's "guilt trip" comments, and the admission of Dr. Jordan's diagrams and testimony regarding Dr. Jordan's autopsy findings. *Supra* at 8, 31. This Court has not found any additional errors. These two errors were harmless, even viewed in the aggregate. Without the guilt trip comments and Dr. Jordan's findings and diagrams, the State's case was still strong, and the jury had more than enough evidence to both convict Petitioner and sentence him to death. This Court cannot say that these errors collectively had a substantial or injurious effect or influence in determining the jury's verdict. The OCCA's cumulative error analysis was not unreasonable in the light of existing Supreme Court precedent. Relief is denied as to Ground Ten.

## V. Request for Abeyance and Equitable Tolling.

Petitioner requests that this case be held in abeyance and for equitable tolling in order to allow counsel to fully investigate the performance of counsel. This Court has already determined that the ineffective-assistance-of-counsel claims, with the exception of one fully developed claim, are procedurally barred. Any further information relating to ineffective assistance of counsel would be irrelevant, because any such ineffectiveness claim would be barred. Also, Petitioner filed his Petition in October of 2012, and complained that his

attempts to send investigators to Cuba had been stymied up to that date. It is now nearly four years later. Petitioner's counsel has had more than enough time to investigate.

## VI. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery (Doc. 19) as well as a motion for an evidentiary hearing (Doc. 27). Both motions should be denied for the following reasons.

Petitioner's discovery request relates tangentially to his Ground Eight. Petitioner seeks to discover why Katya Chacon "backed away" at trial from her initial description of Petitioner as "stupid drunk" on the night of the murder. Doc. 19 at 3. Petitioner seeks to discover whether the prosecution coached her away from that testimony. Petitioner does not raise a *Brady* claim in the body of the Petition; therefore the only applicability the discovery could have would be on his complaint that he did not receive a voluntary intoxication instruction. This Court has denied relief on that ground. In reaching this conclusion, the Court has considered the information which Petitioner provided, including the very descriptions that he claims Chacon "backed away" from. Petitioner's requested discovery would not affect this Court's conclusion on any of Petitioner's claims, and is irrelevant to the claims he raises. Petitioner has not shown good cause for discovery. *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization). Petitioner's discovery request is denied.

In addition to his discovery request, Petitioner requests an evidentiary hearing with respect to his Grounds Five (ineffective assistance of trial counsel) and Six (ineffective

assistance of appellate counsel). Doc. 27 at 2-3. Petitioner also seeks a hearing on the same information for which he submitted discovery. "The purpose of an evidentiary hearing is to resolve conflicting evidence." *Anderson v. Attorney General of Kansas*, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. *Id.* at 859.

An evidentiary hearing is unwarranted on Grounds Five and Six to resolve the legal issues. Every issue that Petitioner raises in his request is procedurally barred, and an evidentiary hearing is unnecessary to make this legal determination. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991) ("The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard."). As to the claims regarding Chacon's testimony, no information gained from an evidentiary hearing would affect this Court's findings on the legal issues. Any information would go to a habeas claim that Petitioner has not raised nor exhausted in state court. Therefore, the requests for discovery and evidentiary hearing are denied.

## VII.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition (Doc. 17), motion for discovery (Doc. 19), and motion for an evidentiary hearing (Doc. 27) are hereby **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 29th day of September, 2016.

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE